[No. A026877. First Dist., Div. Four. Apr. 29, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
GRANT RICHARD POWELL, Defendant and Appellant.

470

472

**COUNSEL**

Abram A. Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Martin S. Kaye and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ANDERSON, P. J.**—Grant Richard Powell (appellant) was arrested April 20, 1969, on charges of assault with a deadly weapon (Pen. Code, § 245)[1] and kidnapping (§ 207). In June 1969 he was found incompetent to stand trial and committed to Atascadero State Hospital; subsequently, when he became competent in March 1973 he was tried for the offenses and found not guilty by reason of insanity. With his commitment to Atascadero set to expire on April 21, 1984, the district attorney petitioned in October 1983 to have it extended an additional two years pursuant to section 1026.5. Following a three-day jury trial in which appellant represented himself, he

---

[1]Unless otherwise indicated, all statutory references are to the Penal Code.

was found to present a substantial danger of physical harm to others and, therefore, his confinement in state hospital was extended two years.

The principal argument advanced on appeal is that appellant should never have been allowed to represent himself in the proceedings below because he lacked the capacity to knowingly and intelligently waive his right to counsel. (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].)

Appellant appeared before the superior court on October 21, 1983, to set a trial date pursuant to his section 1026.2 application (release because of restoration of sanity). He stated there that he wished to waive counsel and represent himself. The trial court strongly recommended that appellant not do so, but gave him a standard form "Petition to Proceed in Propria Persona"[2] to complete before his next court appearance. On October 24 the court ascertained that appellant had filled out the form, then transferred him to another department for a hearing in accord with *Faretta* v. *California, supra,* 422 U.S. 806 (hereafter *Faretta* hearing).

The second court reviewed the petition as appellant had submitted it, noting that he had completed it properly and therefore was educated and could read and write. The court then assured itself that appellant understood the nature of the proceedings against him, the opposition he would face at trial, his responsibilities in representing himself and his burden of proof.[3] It also questioned the basis for his signing the petition, "Cardinal Grant Richard Powell Ph.D." It granted his request to represent himself subject to the understanding that it could be revoked at any time if appellant failed to conduct himself properly during the proceedings.

Back before the original court on November 3 appellant was informed that the district attorney had in the meantime filed a section 1026.5 petition

---

[2]The petition details the constitutional rights of criminal defendants, then asks the applicant to provide his age, education, employment and previous in propria persona experience. It then sets forth virtually all of the advisements and warnings suggested in *People* v. *Lopez* (1977) 71 Cal.App.3d 568, 572-574 [138 Cal.Rptr. 36], for the conduct of a thorough *Faretta* hearing and asks the applicant to acknowledge each statement by initialing it.

[3]The pertinent exchanges are as follows: "THE COURT: . . . Would you give me your understanding of what you are doing in the superior court? [¶] THE PETITIONER: I am representing myself in a court of law in the State of California. [¶] THE COURT: What's these proceedings? [¶] THE PETITIONER: It is a restoration of sanity hearing. . . . THE COURT: Now, you understand that if you were to represent yourself, you would be up against an experienced trial lawyer, Deputy District Attorney, in fact, Mr. Giannini. Do you understand that? [¶] THE PETITIONER: Yes. [¶] THE COURT: And you understand you would have to follow all the technical rules of criminal law, criminal procedures and everything else? [¶] THE PETITIONER: Yes, I am aware of that, your Honor. . . . THE COURT: Now, do you understand what your burden of proof is, what you would have to convince the jury— [¶] THE PETITIONER: Oh, yes. Thank you. [¶] I would have to convince the jury that I am not a danger to others. That's the only thing that I would have to convince the jury of."

and appellant was offered counsel in that matter. Appellant stated once again that he wished to represent himself, and the court, noting that he had just been found competent to do so, held a second abbreviated *Faretta* hearing. In particular the court made sure that appellant understood the difference between a section 1026.2 and a section 1026.5 proceeding. Trial was set for January 3, 1984.

Due to a breakdown in appellant's psychological condition, apparently brought on by his refusal to take medication while in county jail, he was unable to appear in court on his original trial date and was transported to San Francisco General Hospital (SFGH). He was present before the court on January 6 but it ordered him back to SFGH based on a report submitted by Alicia Boccellari, Ph.D., a staff psychiatrist.[4] The report recommended that appellant's medication continue at an increased level and that he remain hospitalized, noting that he was hostile, agitated and subject to paranoid ideation. It also stated that the patient "still does not appear capable of representing himself in court."

Appellant had recovered sufficiently by January 9 so that the trial could begin, and the case at this point was transferred to a third court which had not been privy to the previous *Faretta* hearings. Early in the proceedings the district attorney told the court, "the defendant has had a major psychotic episode in the last weeks. I don't believe that he is a suitable candidate for self-representation. He was hospitalized and unable to come to court for five days in SFGH."

The court asked appellant if he was aware that it could appoint counsel for him and he answered that he was well aware of that fact, but still wished to represent himself. The court noted that there had already been a *Faretta* motion made and granted, and stated: ". . . I don't see any reason to set it aside at this time."

Testimony began on the next day of trial and Dr. Boccellari was the second witness sworn. She made the following statements concerning appellant's condition days before the proceeding: "He clearly could not make his, any of his needs, make his needs known to us. [¶] One of the other aspects to this, which I found somewhat surprising, was that Mr. Powell had alerted me to the fact that he was going to be representing himself in court. I really felt, and I think just in all fairness to Mr. Powell, that he is

---

[4]Appellant cites a number of additional psychiatric reports which he argues have a bearing on the issue of self-representation. The record, however, fails to indicate whether any documents other than Dr. Boccellari's report of January 6, 1984, were considered by any court at a stage in which appellant's right to self-representation might have been debated. We, therefore, confine our discussion to this report and testimony received at trial.

not—I was feeling he was not capable of representing himself in court. There were several reasons for this. One of the things was that he had let me know that he had two psychologists give him psychological testing. . . . [H]e wanted to find out what their opinion of him was. We sat down together and I talked to him about that. He was unable to tell me how he would go about contacting these psychologists to get their opinion. He knew one of the psychologists was a Dr. Carson. He did not know that he could call up information, find the telephone number from information. He did not know, even have the slightest idea that that would be something that he could do. [¶] One of the things I did was to sit down with him. I helped him. I had to make the phone call, to call 411, so we could find out what number Dr. Carson's telephone number was. And my sense of it was that he was having such a difficult time organizing his thinking, he was having a difficult time, he knew he wanted this certain information but he didn't know how to go about getting it. To me that made him appear fairly incompetent."

The district attorney's witnesses testified that appellant was easily agitated, assaultive, incapable of managing his emotions and unwilling to cooperate in his medication. Specifically, they diagnosed him a paranoid schizophrenic exhibiting auditory hallucinations, delusions of grandeur and persecution, grossly disorganized behavior and psychosis. However, Dr. William Johnson, a staff psychiatrist at Atascadero who had had regular contact with appellant for over four years, stated that appellant's symptoms ran an uneven course leaving him at times in good control.

This appeal requires us to address two basic questions: (1) did either of the courts which initially administered appellant's *Faretta* hearings abuse its discretion in determining that appellant knowingly and intelligently waived his right to counsel? and (2) did the trial court err in allowing appellant to continue representing himself, once testimony regarding his mental condition was admitted into evidence? Our answer to both questions is no. However, we find reversible error in the trial court's failure to appoint counsel and to determine appellant's competence to stand trial (§ 1368), once evidence was admitted pointing to the fact that he was unable to assist in his own defense.

We begin our analysis with *People* v. *Lopez, supra,* 71 Cal.App.3d at p. 573, in which Justice Gardner included among many other suggestions for conducting a thorough *Faretta* hearing, "[i]f there is any question in the court's mind as to a defendant's mental capacity it would appear obvious that a rather careful inquiry into that subject should be made—probably by way of a psychiatric examination." But as Justice Gardner himself indicated, in making his suggestions, he did not wish "to appear pedantic" nor "establish any horrendously complex or rigid standards such as now exist in

the taking of a plea of guilt [citation], the submission on a transcript of a preliminary examination [citation], or the admission of a prior [citation]." (*Id.*, at p. 571.)

Later, in *People* v. *Teron* (1979) 23 Cal.3d 103, 114 [159 Cal.Rptr. 633, 588 P.2d 773], disapproved on another ground in *People* v. *Chadd* (1981) 28 Cal.3d 739, 750 [170 Cal.Rptr. 798, 621 P.2d 837], our Supreme Court held that there was no error in granting a defendant's motion to represent himself without first ordering a psychiatric evaluation, where nothing in the record suggested that the defendant lacked the capacity to knowingly and intelligently waive his right to counsel. In so holding, the court agreed with the language in *Lopez* that where such capacity is questioned, a careful inquiry into the subject should be made. (*Ibid.*) However, the court also emphasized that the determination of a defendant's competence in this area is within the sound discretion of the trial court and should not be disturbed on appeal absent a clear showing of abuse thereof. (*Ibid.*)

Court of Appeal decisions after *Lopez* shed further light on the type of evidence which should trigger a questioning of the defendant's capacity to waive counsel, as well as the degree of examination necessary to constitute a "careful inquiry." In *Curry* v. *Superior Court* (1977) 75 Cal.App.3d 221 [141 Cal.Rptr. 884], the trial court was reversed for ruling that the defendant could not act as his own lawyer even though his competence to stand trial had been called into question by the district attorney. The reviewing court acknowledged that the trial court had been made aware of the defendant's eccentricities and mental imbalances, including his assaultive behavior, his obsession with sexual matters and "[his] own behavior in court . . . in which he constantly rambled and showed complete inability to stay with a point or follow direct instructions . . . ." (At pp. 227-228, fn. 2.) However, it ruled that such evidence was irrelevant to the defendant's having knowingly and intelligently waived his right to counsel. (*Ibid.*) To further clarify its position it stated, "*whenever* a psychiatric evaluation is sought to assist the judge at the [*Faretta*] hearing, the evaluation should be limited to *competency to make the required waiver* and not to other competency aspects." (*Id.*, at p. 229, italics added.) Unlike our concurring colleague herein, it did *not* indicate that the trial judge had an affirmative duty to order such an examination based upon the prosecution's allegation that the defendant was not competent to stand trial.

*People* v. *Wolozon* (1982) 138 Cal.App.3d 456 [188 Cal.Rptr. 35], applied *Curry* in a fact pattern very similar to the case at hand. There the trial court refused to allow the defendant to represent himself in a section 1026.5 proceeding because four doctors had submitted reports expressing their belief that his commitment to Atascadero should be extended. The Court of Appeal

reversed on the ground that although the doctors had indicated the defendant posed a present danger to society, there was no evidence of a mental disorder which would specifically impair his ability to waive his right to counsel. (At p. 461.) Again, the court stopped short of ruling that it was necessary to order a separate psychiatric evaluation for this purpose.

The most recent case to address this issue is *People* v. *Leever* (1985) 173 Cal.App.3d 853 [219 Cal.Rptr. 581], which involved a defendant who moved to be *relieved* of his in propria persona status. The trial court refused his request in spite of being in receipt of a letter from the Prisoner Services Division of the San Francisco Sheriff's Office (PSD) which stated he was "suicidal, incapable of understanding 'the nature of his illness,' impaired in judgment, limited in his ability to 'conceptualize abstract thought,' incapable of 'remaining focused' on a given task and demonstrating 'bizarre thinking.'" (At pp. 864-865.) In affirming, the Court of Appeal held that before a trial court is required to order a hearing on the issue of a defendant's capacity to knowingly and intelligently waive his right to counsel, there must be substantial evidence before it that he lacks this specific capacity. The PSD letter was held to be insufficient because it did not make adequate reference to the defendant's competency in this area. (*Ibid.*)

In applying these precedents[5] to the case at hand it becomes clear that neither of the courts which conducted appellant's initial *Faretta* hearings erred in allowing him to represent himself. Both judges were aware of the fact that appellant was before them on a commitment proceeding, and this clearly would have raised doubts in their minds as to his capacity to knowingly and intelligently waive his right to counsel. However, *People* v. *Wolozen, supra*, 138 Cal.App.3d at page 461 stands for the proposition that a defendant's being tried in a section 1026.5 action does *not* in and of itself constitute substantial evidence of his incompetence to make such a choice. Moreover, rather than showing signs of not comprehending the implications of his decision, appellant made it clear that he had garnered a lucid understanding of his rights under the law. Speaking to the original court he stated, "I mean to say that if you're ignorant of the law, it does not mean you cannot defend yourself. You do not have to be very knowledgeable in the law to defend yourself." When the second court tried to explain California case law to him, he interjected, "*Faretta* vs. *California.* I am aware of *Faretta* vs. *California.* [¶] It says I have a right to defend myself."

The second court herein expressed some concern over appellant's believing himself to be a cardinal with a Ph.D., and displayed some appre-

---

[5]We acknowledge appellant's reliance on *People* v. *Tracy* (1970) 12 Cal.App.3d 94 [90 Cal.Rptr. 375], but consider the case to have been effectively superseded by *Faretta* v. *California, supra*, 442 U.S. 806 and the decisions of this state which subsequently applied it.

hension that he might be disruptive of the proceedings. However, it rightly put aside these concerns when determining the issue of his knowing and intelligent waiver. "While bizarre actions and statements are to be noted, they do not establish incompetency warranting deprivation of the right to represent oneself . . . ." (*People* v. *Miller* (1980) 110 Cal.App.3d 327, 332 [167 Cal.Rptr. 816].)

Finally, it is clear that appellant was made aware of all of the pitfalls of self-representation as contemplated by *Faretta* v. *California, supra,* 422 U.S. at p. 835 [45 L.Ed.2d at p. 581]. Appellant was given a form to complete in which he acknowledged all of the rights he was giving up and all of the standard advisements against doing so. More importantly, both courts tried earnestly to dissuade him from representing himself, stating in no uncertain terms their belief that he was making a mistake. Throughout, appellant remained unflappable in his resolve to waive his right to an attorney. On the record before us we find no abuse of discretion in the courts' determination that he did so knowingly and intelligently.

Appellant's next contention is that the *trial court* committed reversible error in allowing him to *continue* representing himself once the district attorney stated, "[appellant] has had a major psychotic episode in the last weeks. I don't believe that he is a suitable candidate for self-representation." He cites *People* v. *Teron, supra,* 23 Cal.3d at pages 114-115, footnotes 6-7, for the proposition that a court has the duty *at any stage of the proceedings* to suspend the trial and order a psychiatric evaluation of the defendant whenever the court has some reason to suspect the voluntariness of his initial waiver of counsel. In effect, he argues that a court's earlier determination that the defendant knowingly and intelligently waived his right to counsel remains effective only insofar as the defendant shows no subsequent signs of being mentally impaired.

We find that *Teron* does not support appellant's position. Again, the *Teron* court ruled there was *nothing* suggestive of mental illness before the trial court when it initially granted defendant's motion to proceed in propria persona, so the trial court did not abuse its discretion in failing to make a careful inquiry into his capacity to knowingly and intelligently waive his right to counsel at that time. (*People* v. *Teron, supra,* 23 Cal.3d at p. 114.) The court went on to suggest that later in the proceedings when some indicia of mental incapacity *did* begin to surface, the trial court "would have acted within its discretion in ordering a psychiatric examination." (*Id.,* at p. 114, fn. 6.) Here the courts which conducted appellant's *Faretta* hearings were at all times aware that his sanity was in question, but were obviously convinced that he was, nonetheless, capable of understanding the consequences of his decision to represent himself. Therefore, this case does not

present a situation in which the defendant's mental condition came into question *for the first time* later in the proceedings, and as a result it is factually distinguishable from *Teron*.

It is true that portions of the *Teron* decision suggest that compelling evidence of mental illness, arising at later stages of the proceedings, could impose a duty on the trial court to reevaluate, by way of a psychiatric examination, defendant's competence to waive counsel. (*People v. Teron, supra,* 23 Cal.3d at pp. 114-115, fns. 6-7.) However, it is equally clear that these sections of the opinion are dictum. The appellant in *Teron* raised only two issues regarding the grant of his motion to represent himself: (1) whether the court should have initially granted the motion without ordering a psychiatric examination and (2) whether the court erred in allowing him to continue representing himself once it became clear that he did not intend to present a defense. (*Id.,* at pp. 114-115.) The court answered the first contention by finding insufficient evidence of mental incapacity to compel an examination and the second, by ruling that a defendant bears no duty to present a defense. (*Ibid.*) These holdings alone constituted the grounds of the court's decision. ██ What remained (in fns. 6 and 7) were incidental statements and conclusions not necessary to the court's decision and, therefore, not to be regarded as authority. (*Simmons v. Superior Court* (1959) 52 Cal.2d 373, 378 [341 P.2d 13]; *People v. Moreno* (1977) 67 Cal.App.3d 962, 967-968 [134 Cal.Rptr. 322].)

██ Were this court to follow the *Teron* dictum as it is interpreted by appellant, it would lead to preposterous results. In a case such as this, where each prosecution witness is called on to give his or her individual view of appellant's mental condition, the trial court is presented with a series of statements which each cast doubt on different areas of the defendant's mental state. Following appellant's logic, the proceedings would have to halt and a psychological examination be ordered each time such evidence of the defendant's mental impairment came to light. Either the trial could not proceed at all, or the court would be forced to appoint counsel in spite of the defendant's having established from the outset that he waived his right to counsel knowingly and intelligently. As illustrated by *People v. Wolozen, supra,* 138 Cal.App.3d at page 456, such action on the part of the trial court would inevitably lead to a reversal of the judgment on appeal. Not only would it tread on the defendant's constitutional right to conduct his own defense, even if ultimately to his detriment (*Faretta v. California, supra,* 422 U.S. at p. 834 [45 L.Ed.2d at p. 581]), it would ignore the precedent which holds that a defendant's right to self-representation may be challenged only in the face of substantial evidence pointing *specifically* to impairment of his ability to knowingly and intelligently waive his right to counsel. (*People v. Leever, supra,* 173 Cal.App.3d at p. 864; *People v.*

*Miller, supra,* 110 Cal.App.3d at p. 331; *Curry* v. *Superior Court, supra,* 75 Cal.App.3d at p. 227.)

The concurrence suggests that the trial court should have felt especially compelled to reevaluate appellant's knowing and intelligent waiver of counsel because it was the district attorney, "to his everlasting credit" and "in the highest traditions of [his] office," who suggested that appellant was not a suitable candidate for self-representation. This point of view overlooks the fact that the district attorney was most likely acting out of self-interest in attempting to have counsel appointed. As the deputy attorney general candidly conceded during oral argument, "district attorneys and prosecutors and [I] personally hate *Faretta.* It just causes trouble and any D.A. would prefer, and especially in that situation prefer to go up against a guy with a lawyer. . . . That was sort of the D.A. being an advocate, trying to push his position. He wanted this guy to have a lawyer."

Moreover, the district attorney's statement that appellant had just suffered "a major psychotic episode" was somewhat misleading. It is perfectly clear from the record that appellant had experienced a setback in his condition due to the fact that he had been refusing to take his medication while he was in county jail awaiting trial. He was transferred to SFGH where his medication was increased to the point where he could be restored to his "baseline level of functioning." The district attorney would, therefore, have better informed the court had he added that the cause of appellant's breakdown had been identified and subsequently remedied.

The concurrence goes on to imply that the trial court made virtually no attempt to investigate whether or not appellant had regained his sensibilities in the wake of his "major psychotic episode." It suggests that the court's only effort in this regard was to obtain "yes" or "no" answers to a few general questions about appellant's desire to continue representing himself. This ignores the series of exchanges that took place between the court and appellant minutes before the district attorney expressed his opinion about appellant's mental condition, which demonstrated appellant's capacity for clear and logical thought. Appellant argued that his section 1026.2 application should go to trial ahead of the district attorney's section 1026.5, subdivision (b), petition. He correctly pointed out to the court that if he prevailed under section 1026.2, he would be able to gain his release sooner than if the prosecution were unsuccessful under section 1026.5. He also recounted accurately the events of a hearing held four months earlier in which the court he was before originally agreed to try the case in the order he suggested. It, therefore, belies the record to assert that the trial court had no real indication of appellant's present psychological condition.

These observations point to the conclusion that when a defendant has been found to have effectively waived his right to counsel, if the court hears charges that the defendant is mentally impaired it should make a "careful inquiry" into the *basis* for such allegations. In this case it appears that the trial court found there was no reason to set aside the grant of appellant's *Faretta* motion in large part because it had reason to disagree with the prosecution's assessment of appellant's condition.

It seems clear that the only way to protect a defendant's rights under *Faretta,* while at the same time assuring the efficient administration of justice, is to allow the trial court to defer to a defendant's initial grant of in propria persona status except under the most extraordinary circumstances. If, for example, specific and reliable evidence came to the trial court's attention which convinced it that the defendant lacked the capacity to knowingly and intelligently waive his right to counsel *at the time he made this decision,* it would then be compelled to reconsider the propriety of the original grant. The same would be true if the court learned of some intervening event which resulted in the defendant's having lost this specific capacity. We emphasize that the evidence would have to be substantial. (*People* v. *Leever, supra,* 173 Cal.App.3d at p. 864.) In addition, the decision whether or not to act on such information would be addressed to the sound discretion of the trial court, and could not be disturbed on appeal absent a clear showing of abuse thereof. (*People* v. *Teron, supra,* 23 Cal.3d at p. 114.)

By this standard the court below committed no error in failing to order a reexamination of appellant's waiver of counsel. The district attorney lacked sufficient expertise to render his assessment of appellant's condition reliable. The testimony of the experts called by the prosecution was all directed to whether or not appellant continued to present a danger to society; none were asked their opinion on the *Faretta* issue. The statements by the district attorney and Dr. Boccellari to the effect that appellant was incapable of effectively representing himself in court were conclusionary and irrelevant to the issue of effective waiver of counsel: "'It is not . . . essential that defendant be competent to serve as counsel in a criminal proceeding [citation]; "his technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself." [Citations.]'" (*People* v. *Joseph* (1983) 34 Cal.3d 936, 943 [196 Cal.Rptr. 339, 671 P.2d 843].)

We next consider the question of whether or not the trial court erred in failing to order a section 1368 hearing.[6] This issue was brought to

---

[6]Section 1368 reads in pertinent part: "(a) If, during the pendency of an action and prior

our attention by what we perceived to be a confusion on appellant's part over the standard to be applied in determining one's competence to stand trial, as opposed to that applied in evaluating a knowing and intelligent waiver under *Faretta*. Crucial to the former, but irrelevant to the latter are Dr. Boccellari's statements at trial to the effect that days before the hearing appellant had been unable to focus his attention sufficiently to even contact the psychologists whom he planned to call as witnesses. She concluded this testimony by observing, "in order to use the hospital phone he needed to dial 9 to get an outside line and 411. I must have given him those instructions five separate times and he was still not able to do it . . . ."

■ "[A]n accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him *or of assisting in his defense.*" (*People* v. *Burney* (1981) 115 Cal.App.3d 497, 502 [171 Cal.Rptr. 329], italics added.) "The duty imposed upon the trial judge by the statute [§ 1368] is not conditioned on a motion in reliance on the code provision." (*People* v. *Aparicio* (1952) 38 Cal.2d 565, 568 [241 P.2d 221].) Also, in enacting section 1368 "the [L]egislature intended that at whatever point in the trial the doubt should arise, the proceedings should stand suspended until a trial of that issue, but when the defendant should be found sane they should be taken up at that point and the case proceed." (*People* v. *Rothrock* (1936) 8 Cal.2d 21, 24 [63 P.2d 807].)

It must be noted that while a trial court has broad discretion to evaluate a charge of mental infirmity as it bears on the knowing and intelligent waiver of counsel, its course of action upon hearing evidence of a defendant's incompetence to stand trial is more closely circumscribed. "Once such substantial evidence appears, a doubt as to the sanity of the accused exists and a hearing is mandatory no matter how persuasive other evidence, testimony of prosecution's witnesses, *or the court's observations of the accused* may be to the contrary." (*People* v. *Burney, supra,* 115 Cal.App.3d at

---

to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. *If the defendant is not represented by counsel, the court shall appoint counsel.* At the request of the defendant or his counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time. [¶] (b) If counsel informs the court that he believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he believes the defendant is mentally competent, the court may nevertheless order a hearing . . . ." (Italics added.)

p. 502, citing *People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942], italics added.)

█ Dr. Boccellari's testimony was substantial evidence that *because of mental illness,* appellant was incapable of assisting in his own defense. This was not a case of an in propria persona defendant doing a poor job of preparing his case or electing to present no defense at all, situations which would call for no action whatsoever on the part of the trial court. (*People* v. *Joseph, supra,* 34 Cal.3d at p. 943; *People* v. *Teron, supra,* 23 Cal.3d at p. 115.) Here, appellant had attempted to call upon the witnesses he would need to defend himself at trial, but due to an impairment of his cognitive functions, found himself unable to do so. Under these circumstances, even if the trial court was convinced that appellant had regained his faculties by the time he returned to court, it had a duty to appoint counsel to determine whether or not a hearing under section 1368 was necessary. The court's failure to do so constituted an abuse of discretion.

The judgment is reversed and the case remanded for proceedings not inconsistent with this opinion.[7]

Channell, J., concurred.

**POCHÉ, J.**—I concur in the judgment only. I write separately principally because I consider that the majority's analysis adds an additional and unnecessary layer of complexity to the already difficult task of trying Penal Code section 1026.5[1] cases.

The primary issue presented in this case, also the primary issue briefed, is whether the trial court erred in allowing defendant to proceed to represent himself without making some inquiry into whether he was mentally competent to waive his right to counsel. Unlike my majority colleagues I answer that question affirmatively: the trial court erred.

The underlying rationale of the majority opinion is that the trial court had no obligation to reexamine in a genuine way whether at the time of trial defendant was mentally competent to waive his right to counsel. My colleagues' notion apparently is that *Faretta*[2] status once achieved is like the plague—you just must let it run its course. After all, as the trial court here explained, there had already been a *Faretta* hearing before another judge.

---

[7]In light of this holding, appellant's contention that the trial court erred in hearing the section 1026.5 petition before the section 1026.2 petition, need not be decided.

[1]All statutory references are to the Penal Code.

[2]*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].

Notwithstanding the majority opinion's implications to the contrary, the law of this state as spelled out repeatedly in *People* v. *Teron* (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773] is unmistakably clear: even after a *Faretta* motion has been properly granted (as it was in *Teron*) the trial court has a continuing obligation to monitor the defendant to determine whether he displays "indicia of mental incapacity" and if the trial court has "some reason to suspect defendant's mental capacity" it would be acting within its discretion in requiring a psychiatric examination to reconsider defendant's mental competence *to waive counsel.* (See *People* v. *Teron, supra,* 23 Cal.3d at p. 114, fn. 6.) If the trial court fails to so "interrupt proceedings to order such an examination" it is subject to reversal for an abuse of discretion if the evidence of mental incapacity is "compelling." (*Ibid.*) Given the Supreme Court's repeated examination of the extent of such evidence *at each stage of the proceedings* in *Teron* (see *id.,* at pp. 114-115 [text and fns. 6, and 7]) it is a little hard to understand how or why this court should characterize as "dictum" Justice Tobriner's specific and explicit agreement with the rule as spelled out by the Court of Appeal in *People* v. *Lopez* (1977) 71 Cal.App.3d 568, 573 [138 Cal.Rptr. 36]: "'If there is any question in the court's mind as to a defendant's mental capacity it would appear obvious that a rather careful inquiry into that subject should be made—probably by way of a psychiatric examination.'" (*People* v. *Teron, supra,* at p. 114.)

Thus there are only two questions in this present proceeding: (1) was there sufficient evidence of mental incapacity to trigger what Justice Gardner in *Lopez* and Justice Tobriner in *Teron* have described as "a rather careful inquiry"; and (2) did such an inquiry take place? The majority never reach the second question.

Well, here is what actually happened. After a five-day continuance the matter—the petition of the People to extend the commitment of defendant pursuant to section 1026.5—was called for trial. At that point the deputy district attorney, to his everlasting credit, informs the court: "First of all, the defendant has had a major psychotic episode in the last weeks. I don't believe that he is a suitable candidate for self-representation. He was hospitalized and unable to come to court for five days [as he was in San Francisco General Hospital]."

"THE DEFENDANT: That is an error. I have never in my life had a nervous breakdown. The toxic drugs they give me down at Atascadero. I have a strong powerful mind. I am in full—I am in control of myself at all times. I have never slugged somebody for no reason at all. They usually—I am usually the one that is—others initiate the fighting.

"THE COURT: You have been representing yourself previously on these 1026 proceedings?

"THE DEFENDANT: No, sir. This is the first time in all this time. I can have justice. I'm going to defend myself. My mother has paid out thousands of dollars and it's just wasted money. Thousands of dollars for lawyers.

"THE COURT: How many times have you gone through a 1026 proceeding?

"THE DEFENDANT: It's been three—about three, I believe. [¶] Let me explain to you what exactly what kept me from gaining me release before. These people from Atascadero, technicians, say they know me, observed me and they come with outright lies in court. They lie so grossly you can hardly believe just no factual thing to it at all. In fact, one thing—I will give you one example. This woman spoke. Her name is Patty. I can't recall her last name. Let's see. Thornhaven, was that it? I'll tell you what she said. She said that Grant had spoken to her and told her that I wanted to kill all the Sicilian people and she said she is a Sicilian also. This is not true. I have never said that statement, never even thought of a statement like that. As a matter of fact, my wife was Sicilian, my ex-wife. And I have never wanted to kill her nor any Sciclians [*sic*] at any time. I have form [*sic*] an affection for Sciclians [*sic*]. I know the family, my wife's family. They came from Italy. And I like them. I have high respect for Sicilian people.

"THE COURT: You understand that if you want a lawyer and you didn't have the money to hire a lawyer that the Court would appoint one for you?

"THE DEFENDANT: No. I will help—

"THE COURT: But do you understand?

"THE DEFENDANT: Yes. I do understand that very well. Thank you, sir.

"THE COURT: And you still wish to represent yourself?

"THE DEFENDANT: Yes. I do. Thank you, sir.

"THE COURT: All right. [¶] Apparently, there has been a Faretta motion made and granted, and I don't see any reason to set it aside at this time."

On the first question the majority find the prosecution's statement of warning to be "conclusionary and irrelevant to the issue of effective waiver

of counsel." (Majority opn., *ante*, p. 481.) What could be more relevant than the apt description given: defendant had just suffered a major psychotic episode resulting in his hospitalization for the five days immediately preceding trial? If that description is also "conclusionary" so that it can be ignored by the trial court then any deputy district attorney who steps forward in the highest tradition of that office to let a trial judge know in no uncertain terms that a defendant is seriously impaired is now required by the majority to be an expert in the language of psychological symptoms.

The majority also points to the lack of evidence *at trial* regarding defendant's competency to waive his right to counsel. The prosecutor questioned his experts about the subject on which he had the burden of proof, i.e., did defendant, "by reason of a mental disease, defect, or disorder" represent "a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1).) Since when does the prosecutor, at that point, have any duty to question his experts about defendant's mental competency to waive counsel?

In my view, intelligent, probing inquiry by the trial court was compelled once the prosecutor brought the matter of defendant's breakdown to the court's attention. No such inquiry was even begun. Reversal is thus required under *People* v. *Teron, supra*, 23 Cal.3d 103.

It is also beyond me why the majority seeks to reverse on a theory neither raised nor briefed. What the majority holds is there was no reason to examine whether defendant at the time of trial was mentally competent to waive counsel but there was reason to examine whether he was incompetent to stand trial—a matter to be determined under the majority analysis by applying the standard of section 1367. That standard includes judging whether a defendant is "unable to . . . assist counsel in the conduct of a defense in a rational manner." (§ 1367.) What the majority appears to hold is that defendant passed the *Faretta* test, i.e., he was competent to make the decision to represent himself but he may have been incompetent to assist himself in the conduct of his defense in a rational manner. If it is true as the majority insist that prosecutors "hate" the *Faretta* decision of the United States Supreme Court, this new layer of complexity in the trial of section 1026.5 cases is unlikely to be viewed by them as an improvement.

For these reasons I, too, would reverse the judgment but would do so only on the basis of the starkly obvious *Faretta-Teron* error.